Filed 7/31/13  P. v. Anunciation CA4/1
Opinion following transfer from Supreme Court

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D054988 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. INF056054) |
| MICHAEL ANUNCIATION, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, James S. Hawkins, Judge.  Affirmed.

Marcia R. Clark for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Lynne McGinnis and Donald W. Ostertag, Deputy Attorneys General, for Plaintiff and Respondent.

Michael Anunciation's appeal of the judgment sentencing him to prison after a jury found him guilty of second degree murder is again before us after transfer from the California Supreme Court. Anunciation contends the trial court erred by (1) admitting expert testimony conveying a nontestifying forensic pathologist's autopsy findings, in violation of his Sixth Amendment right to confront adverse witnesses; (2) admitting statements obtained in violation of his Fifth Amendment right not to be compelled to be a witness against himself; and (3) refusing to instruct the jury on two theories of voluntary manslaughter as a lesser included offense of murder. In our prior opinion, we rejected the Fifth Amendment claim, but agreed with the Sixth Amendment claim and reversed the judgment on that ground. We did not consider his instructional error claim.

The California Supreme Court granted the People's petition for review, and held the case pending decisions in of *People v. Lopez* (2012) 55 Cal.4th 569, *People v. Dungo* (2012) 55 Cal.4th 608 (*Dungo*), and *People v. Rutterschmidt* (2012) 55 Cal.4th 650. Those decisions rejected claims that the Sixth Amendment right of a criminal defendant to confront adverse witnesses was violated when a prosecution expert testified about certain information contained in a report prepared by someone who did not testify at trial. After issuing its decisions in *Lopez*, *Dungo* and *Rutterschmidt*, the Supreme Court transferred Annunciation's appeal back to us with directions to vacate our prior opinion and to reconsider the appeal in light of those decisions. Having complied with the Supreme Court's directions, we now reject Anunciation's claims of error and affirm the judgment.

# I.

## FACTUAL AND PROCEDURAL BACKGROUND

Anunciation was acquainted with 85-year-old Garvin Shallenberger, who had paid Anunciation a number of times for oral sex. On the day he was killed, Shallenberger and Michael Brinkmann, a helper Shallenberger employed to assist him around the house, picked up Anunciation at a local store and brought him back to Shallenberger's home so that Shallenberger could perform fellatio on him. Brinkmann, who was aware of the purpose of the meeting, left Shallenberger and Anunciation at the home after Shallenberger asked Brinkmann to wait elsewhere.

More than an hour later, Brinkmann and some neighbors looked through a sliding glass door in Shallenberger's home, saw Shallenberger lying on the floor, and telephoned 911. Responding paramedics pried the door open and found Shallenberger dead.

Anunciation was arrested after he admitted strangling Shallenberger in interviews with homicide investigator Jeff Buompensiero. Anunciation told Buompensiero that after Brinkmann left the house, Shallenberger undressed, sat on the couch, and performed fellatio on Anunciation as he stood before Shallenberger. Shallenberger started to make choking sounds, which Anunciation said "grossed [him] out." According to Anunciation, Shallenberger had bitten his penis, after which Anunciation pushed Shallenberger away, grabbed him, and choked him until he turned blue and "dropped down." Anunciation then "freaked out"; grabbed Shallenberger's wallet, laptop computer, telephones, and answering machine; and "took off."

3

The People charged Anunciation with first degree murder (Pen. Code, § 187, subd. (a); subsequent undesignated section references are to this code), grand theft (§ 487, subd. (a)), and robbery (§ 211). The People also alleged Anunciation had served two prior prison terms. (§ 667.5, subd. (b).)

In the first trial, the jury found Anunciation not guilty of first degree murder, but was unable to reach a verdict as to the lesser included offense of second degree murder or voluntary manslaughter, and the court declared a mistrial as to those offenses. The jury also found Anunciation guilty of two counts of petty theft in violation of section 488, a lesser included offense of the theft and robbery charges.

Anunciation was retried on a second degree murder charge. In the second trial, as in the first, the prosecution introduced autopsy findings regarding Shallenberger's injuries and the circumstances, manner and cause of his death through the testimony of Joseph I. Cohen, chief forensic pathologist for Riverside County. The autopsy was performed by a contract pathologist for the county, Darryl Garber. Garber did not testify at either trial or at any other point in the proceedings. Cohen did not supervise or participate in the autopsy, but reviewed all of the written autopsy records, including the autopsy report, and testified at length about Shallenberger's injuries as described in the autopsy report prepared by Garber. Specifically, Cohen testified about discoloration, bruising and abrasions on Shallenberger's head, neck and tongue; a large amount of hemorrhaging in his eyes and the internal tissues of his neck; and multiple fractures of his larynx and hyoid bone, which were not common in manual strangling. Cohen pointed out some of

4

the external injuries in a photograph of Shallenberger's head that was admitted into evidence without objection.

Because the injuries to the body indicated Shallenberger was beaten multiple times while conscious, and then manually strangled to death after he was unconscious, Cohen testified that Shallenberger's killer used a significant amount of force for several minutes. Based in part on Cohen's testimony, the prosecution argued Anunciation intended to kill Shallenberger, or at least knew his actions were likely to kill Shallenberger, and was thus guilty of second degree murder.

Cohen also testified Shallenberger's injuries were not consistent with a reflexive reaction by one whose penis was bitten during fellatio. Cohen explained the penis is richly innervated, and a bite to the penis would cause pain. The pain, in turn, would cause a discharge of adrenaline and a reflexive response to avoid the biter by backing away or pushing the biter away. The amount of adrenaline released would not be significant, however, and the associated avoidance response would be "fairly quick." When asked whether the reflexive response induced by a bite to the penis during fellatio could explain the injuries Shallenberger suffered, Cohen responded, "Of course not."

In the second trial, the jury found Anunciation guilty of second degree murder. Anunciation waived his right to a jury trial on the prior prison term allegations and admitted he had served a two prison terms. The court sentenced Anunciation to prison for 15 years to life, plus a concurrent sentence of 180 days for the convictions of misdemeanor theft, and consecutive terms of one year for each prior prison term.

5

## II.

## DISCUSSION

As we stated earlier, Anunciation seeks reversal of the judgment on three grounds: (1) violation of his Sixth Amendment right to confront adverse witnesses; (2) violation of his Fifth Amendment right against compulsory self-incrimination; and (3) erroneous refusal to instruct the jury regarding voluntary manslaughter. We shall address each ground in turn.

A.   *The Admission of Cohen's Testimony About the Autopsy Findings Did Not Violate Anunciation's Sixth Amendment Right to Confront Adverse Witnesses*

Anunciation contends that in permitting Cohen to testify about the findings from Garber's autopsy report, the trial court violated the right of a criminal defendant "to be confronted with the witnesses against him." (U.S. Const., 6th Amend.; see *Pointer v. Texas* (1965) 380 U.S. 400, 403 ["the Sixth Amendment's right of an accused to confront the witnesses against him is . . . a fundamental right and is made obligatory on the States by the Fourteenth Amendment"].) Specifically, Anunciation argues he was unconstitutionally precluded "from cross-examining the percipient witness whose observations of the injuries formed the basis for . . . critical conclusions" on the "key issue" in the case, namely, "whether the crime committed was murder or manslaughter." Under compulsion of recent authority from our Supreme Court, we reject this argument.

6

1. *Anunciation Did Not Forfeit the Claim of Error*

As an initial matter, we address the People's contention that Anunciation forfeited his Sixth Amendment claim because he failed to object to Cohen's testimony in the trial court. Anunciation admits he failed to object, and generally a defendant who fails to object to the admission of evidence on the basis of the confrontation clause forfeits the right to raise the issue on appeal. (*People v. Burgener* (2003) 29 Cal.4th 833, 869; *People v. Alvarez* (1996) 14 Cal.4th 155, 186.) Anunciation contends, however, that an objection is not required where, as here, it would be futile under controlling law. (*People v. Morton* (2008) 159 Cal.App.4th 239, 249.) We agree.

The controlling authority for admitting forensic testimony at the time of Anunciation's second trial in September 2007 was the California Supreme Court's decision in *People v. Geier* (2007) 41 Cal.4th 555 (*Geier*). *Geier* held testimony about a DNA report, laboratory notes, and test results was admissible when conveyed through a testifying supervisor, rather than the laboratory analyst who performed the tests, because the report, notes, and results were not "testimonial" evidence subject to the demands of the confrontation clause under *Crawford v. Washington* (2004) 541 U.S. 36, 59, and subsequent United States Supreme Court precedent. (*Geier*, at pp. 602-604, citing *Davis v. Washington* (2006) 547 U.S. 813, 817.) Reading *Crawford* and *Davis* as requiring courts to focus their inquiry on how the evidence was created, the *Geier* court reasoned the results were not testimonial because they were recorded as they were observed, even if they were prepared for use at trial. (*Geier*, at pp. 606-607.)

7

Cohen's testimony was analogous to the laboratory supervisor's testimony that *Geier* held admissible, in that Cohen was chief pathologist and conveyed what were apparently contemporaneously-recorded observations made by Garber during his autopsy of Shallenberger. At the time Anunciation was retried, the trial court was thus bound by *Geier* to admit Cohen's testimony, and any objection by Anunciation would have been futile. We thus conclude Anunciation has not forfeited his Sixth Amendment claim.

2.     *Anunciation's Claim of Error Fails Under* Dungo

On the merits, Anunciation contends Cohen's testimony relaying findings from the autopsy report prepared by Garber, who did not testify at trial or at any other point in the proceedings, violated the Sixth Amendment right of an accused to confront his accusers. Although we agreed with this contention when this appeal was first before us, our Supreme Court's grant of the People's petition for review and transfer of the matter back to us for reconsideration in light of its recent Sixth Amendment decisions requires that we now reject it.

In *Dungo*, *supra*, 55 Cal.4th 608, the Supreme Court considered and rejected a Sixth Amendment claim that is not materially indistinguishable from Annunciation's. At Dungo's murder trial "a forensic pathologist testifying for the prosecution described to the jury objective facts about the condition of the victim's body as recorded in the autopsy report and accompanying photographs. Based on those facts, the expert gave his independent opinion that the victim had died of strangulation. Neither the autopsy report, which was prepared by another pathologist who did not testify, nor the photographs were

8

introduced into evidence." (*Id.* at p. 612.) A jury found Dungo guilty of second degree murder, and the trial court sentenced him to prison for 15 years to life. (*Id.* at p. 615.) The Court of Appeal reversed the judgment on the ground the admission of the expert's trial testimony about the cause of the victim's death violated Dungo's Sixth Amendment right to confront and cross-examine the pathologist who prepared the autopsy report. (*Id.* at pp. 615-616.) Our Supreme Court disagreed, and reversed the judgment of the Court of Appeal. (*Id.* at p. 621.)

The California Supreme Court analyzed several decisions from the United States Supreme Court and concluded the Sixth Amendment right to confront and cross-examine adverse witnesses applies only to witnesses whose statements are "testimonial," i.e., "made with some degree of formality or solemnity" *and* for a "primary purpose pertain[ing] in some fashion to a criminal prosecution." (*Dungo*, *supra*, 55 Cal.4th at p. 619.) As to the formality of autopsy reports, the *Dungo* court reasoned that "statements describing the pathologist's anatomical and physiological observations about the condition of the body . . . , which merely record objective facts, are less formal than statements setting forth" the pathologist's conclusions as to the cause of the victim's death. (*Ibid*.) As to the primary purpose of autopsy reports, the *Dungo* court reasoned that the "usefulness of autopsy reports, including the one at issue here, is not limited to criminal investigation and prosecution; such reports serve many other equally important purposes," such as deciding whether to file a wrongful death action, determining insurance coverage, satisfying the public's interest in knowing the cause of death, and

9

providing answers to grieving family members. (*Id.* at p. 621.) Based on this reasoning, the *Dungo* court held the expert's "description to the jury of objective facts about the condition of [the] victim['s] body, facts [the expert] derived from [a nontestifying pathologist's] autopsy report and its accompanying photographs, did not give defendant a right to confront and cross-examine [the nontestifying pathologist]. The facts that [the expert] related to the jury were not so formal and solemn as to be considered testimonial for purposes of the Sixth Amendment's confrontation right, and criminal investigation was not the primary purpose for recording the facts in question." (*Ibid.*)

As a Court of Appeal, we are bound by our Supreme Court's decision in *Dungo*. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 ["The decisions of this court are binding upon and must be followed by all the state courts of California."].) We therefore reject the claim that Cohen's testimony about Shallenberger's injuries, which related contents of the autopsy report prepared by Garber, violated Anunciation's Sixth Amendment right to confront and cross-examine Garber.

B.   *The Admission of Anunciation's Statements to Buompensiero Did Not Violate the Fifth Amendment Right Against Compulsory Self-incrimination*

Anunciation contends the trial court erroneously denied his motion to suppress incriminating statements that he asserts the police obtained in violation of his right not to "be compelled in any criminal case to be a witness against himself." (U.S. Const., 5th Amend.; see *Malloy v. Hogan* (1964) 378 U.S. 1, 6 ["the Fifth Amendment's exception from compulsory self-incrimination is also protected by the Fourteenth Amendment

10

against abridgment by the States"].) After setting forth additional pertinent background, we shall explain why this contention has no merit.

1. *Additional Pertinent Background*

Buompensiero identified Anunciation as a suspect from telephone records and store surveillance videotapes showing Anunciation using Shallenberger's credit cards after the killing. Buompensiero told Anunciation's former girlfriend, Mia Fletcher, that Anunciation was a suspect and that he should call Buompensiero. Anunciation called Buompensiero the next day, 11 days after Shallenberger's death, and agreed to come to the station to answer questions. He asked for a ride, and Buompensiero sent detectives to pick him up.

Two detectives in plain clothes with holstered guns met Anunciation at Fletcher's house, and Anunciation voluntarily agreed to accompany them to the sheriff's station. Anunciation sat in the front seat of their sedan and was not handcuffed.

The interview, which was videotaped, was held in a small, carpeted room with two chairs at the sheriff's station. The only other person in the room was Buompensiero, who interviewed Anunciation. Buompensiero began the interview by giving Anunciation the warnings required by *Miranda v. Arizona* (1966) 384 U.S. 436, 444 (*Miranda*). Anunciation said he wanted a lawyer. Buompensiero left the room for 15 minutes. When he returned, and before questioning Anunciation, Buompensiero reminded Anunciation he had come voluntarily, was free to leave at any time, and was not under

11

arrest.  Anunciation acknowledged he understood and knew how to exit the room and the building.

Buompensiero then asked Anunciation about his use of Shallenberger's credit cards.  Anunciation admitted he had met Shallenberger on the day he was killed, was "whacked out" on "speed," and just wanted some money.  Anunciation said Shallenberger had paid him on multiple occasions for oral sex, but claimed he did not want to have oral sex with Shallenberger on the day of the killing.  Annunciation said that when Shallenberger became irate, he took Shallenberger's wallet, credit cards, laptop computer, and telephones, and then departed.

After about 45 minutes of questioning, Anunciation asked Buompensiero if he was "busted" for taking Shallenberger's credit cards and property.  Buompensiero said they would wait to see what the district attorney wanted to do, and then asked Anunciation where he would be staying.  Anunciation said he was "going nowhere" and could be reached at his mother's house.  Anunciation left the station alone, after waiting approximately 20 minutes in the lobby for a detective to give him a ride.

A short time later, the detective who was to give Anunciation a ride located Anunciation at a bus stop.  The detective asked Anunciation if he wanted a ride, and he accepted.  As the detective drove Anunciation toward his mother's house, Buompensiero telephoned the detective and asked him to see if Anunciation would return to the station to answer more questions.  Anunciation agreed to return.

12

Anunciation's second interview, which was also recorded, lasted 34 minutes. Buompensiero began the interview by stating that Anunciation was not under arrest and was free to leave at any time, as before. Anunciation said he understood and knew where the door was. A few minutes into the interview, after asking about what had occurred on the day Shallenberger was killed, Buompensiero told Anunciation he had some more questions for which he would give Anunciation his *Miranda* warnings. After Buompensiero read the warnings, Anunciation acknowledged he understood each of them. Buompensiero then asked Anunciation about his telephone calls to Shallenberger, told Anunciation Shallenberger was dead, and asked him to explain what had happened since Annunciation was the last person with him.

In response, Anunciation admitted he choked Shallenberger until he turned blue after Shallenberger bit him during fellatio. After making these admissions, Anunciation said to Buompensiero that he "better get a lawyer now" and asked if he could go home for the night. Buompensiero told Anunciation he would discuss "a few things here with my boss" and left the room. When he returned, he arrested Anunciation.

Before his first trial, Anunciation moved to exclude his statements to Buompensiero on the ground they had been obtained in violation of his Fifth Amendment right against compulsory self-incrimination. The trial court denied the motion after an evidentiary hearing, ruling that Anunciation had not been in custody. The court found Anunciation voluntarily went to the police station to be interviewed and had reinitiated questioning after being told he was free to go. The court also found Anunciation

13

voluntarily returned for the second interview, and made his admissions about killing Shallenberger after being read his *Miranda* rights and implicitly waiving them; the interviews were not coercive, but low-key and conversational, without heavy-handed tactics; and Anunciation was calm, not nervous.

2.      *Legal Analysis*

Anunciation contends that because he was in continuous custody during both interviews and asked for a lawyer at the outset of the first interview, his statements in response to Buompensiero's questions were obtained in violation of his Fifth Amendment right against compulsory self-incrimination and were therefore inadmissible at trial. Anunciation also contends admission of his statements was improper because he never validly waived his *Miranda* rights.  For reasons we shall explain, we disagree.

a.      *General Legal Principles*

The scope of our review of a claim that a statement or confession is inadmissible because it was obtained in violation of a defendant's Fifth Amendment rights is well established.  " 'We must accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if they are substantially supported.  [Citations.] However, we must independently determine from the undisputed facts, and those properly found by the trial court, whether the challenged statement was illegally obtained.'  [Citations.]  We apply federal standards in reviewing defendant's claim that the challenged statements were elicited from him in violation of *Miranda*."  (*People v. Bradford* (1997) 14 Cal.4th 1005, 1033.)

14

In *Miranda*, the United States Supreme Court held the right against compulsory self-incrimination is "fully applicable during a period of custodial interrogation." (384 U.S. at p. 460.) Thus, the prosecution may not use a defendant's statements obtained during custodial interrogation by law enforcement unless, before questioning begins, the defendant is advised of his rights to silence, to consult with a lawyer, to have the lawyer with him during interrogation and to appointed counsel. (*Id.* at p. 471.) These warnings are needed to safeguard an accused against the "inherently compelling pressures" of in-custody interrogation, "which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." (*Id.* at p. 467.) Furthermore, if an individual subject to custodial interrogation requests a lawyer, the interrogation must stop until the individual's counsel is present, unless the individual initiates further communication with police. (*Minnick v. Mississippi* (1990) 498 U.S. 146, 153 (*Minnick*); *Edwards v. Arizona* (1981) 451 U.S. 477, 484-485 (*Edwards*).)

The right to counsel under *Miranda* and *Edwards* "applies only in the context of custodial interrogation. If the defendant is not in custody then those decisions do not apply . . . ." (*Montejo v. Louisiana* (2009) 556 U.S. 778, 795; see also *People v. Nguyen* (2005) 132 Cal.App.4th 350, 355 [defendant who called attorney during arrest but before interrogation did not effectively assert right to counsel]; *People v. Avila* (1999) 75 Cal.App.4th 416, 422 & fn. 8 [because *Miranda* rights cannot be invoked except during custodial interrogation, accused being arraigned on one charge cannot prospectively invoke his or her *Miranda* rights to counsel as to some other unrelated charge by a

15

written "invocation of rights" form].) As both parties recognize, the threshold issue in this case is therefore whether Anunciation was in custody when he was questioned by Buompensiero.

A suspect is in custody for purposes of the Fifth Amendment when he is "deprived of his freedom of action in any significant way." (*Miranda*, *supra*, 384 U.S. at p. 444; accord, *People v. Mickey* (1991) 54 Cal.3d 612, 648.) To determine whether a person who has not been formally arrested is in custody, we examine, based on a totality of the circumstances, "how a reasonable man in the suspect's position would have understood his situation." (*Berkemer v. McCarty* (1984) 468 U.S. 420, 442; see also *People v. Ochoa* (1998) 19 Cal.4th 353, 401 (*Ochoa*).) "[T]he ultimate inquiry is simply whether there is a '. . . restraint on freedom of movement' of the degree associated with a formal arrest." (*California v. Beheler* (1983) 463 U.S. 1121, 1125 (*Beheler*); accord, *Ochoa*, at p. 401.) The test is objective; the subjective views of the interrogating officer or the person being questioned are generally irrelevant to the determination. (*Stansbury v. California* (1994) 511 U.S. 318, 323 (*Stansbury*).)

In determining whether a defendant is "in custody," courts consider a number of objective criteria, such as whether contact was initiated by law enforcement; whether the suspect voluntarily agreed to an interview; the ratio of officers to suspects during the interview; the officers' demeanor; whether the officers informed the suspect he was under arrest or free to terminate the interview and leave; whether the officers dominated and controlled the course of the interrogation; whether the officers manifested a belief the

16

person was culpable and they had evidence to prove it; whether techniques to pressure the suspect were employed; and whether the suspect was arrested at the close of the interview. (*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1162; *People v. Forster* (1994) 29 Cal.App.4th 1746, 1753.) "[C]ourts [also] consider highly significant whether the questioning was brief, polite, and courteous or lengthy, aggressive, confrontational, threatening, intimidating, and accusatory." (*Aguilera*, at p. 1164.)

b.    *Application to This Case*

Applying the foregoing principles to this case, we conclude substantial evidence supports the trial court's findings that Anunciation voluntarily participated in the interviews, and reinitiated questioning after requesting a lawyer.[1] Anunciation called Buompensiero of his own accord, agreed to meet with him, and asked for a ride to the station. After Anunciation said he wanted a lawyer, Buompensiero told Anunciation he was free to leave, and Anunciation acknowledged he was free to leave and knew how to leave. At that point, Anunciation reinitiated the conversation, saying "What do you want to ask me?" Anunciation left the sheriff's station after the first interview on his own. He also willingly accepted another ride from a detective to go to his mother's house, and agreed to return to the station for more questions. Additionally, having reviewed the

---

[1]    Our conclusion Anunciation was not in custody makes it unnecessary for us to decide whether his reinitiation of communication with Buompensiero would be sufficient to satisfy the exception, under *Edwards* and *Minnick*, that permits questioning by police after a defendant has requested counsel but then reinitiates " 'communication, exchanges or conversations with the police.'" (*Minnick*, *supra*, 498 U.S. at p. 152; *Edwards*, *supra*, 451 U.S. at pp. 484-485.)

17

videotapes and transcripts of the interviews, we agree with the trial court's characterization of the questioning as "low-key, slow questions, no heavy-handed tactics . . . not intense, persistent, or accusatory." The questioning remained so throughout both interviews.

We further conclude Anunciation was not in custody during the police interviews. Anunciation called Buompensiero of his own accord and indicated he was willing to answer questions, both before and during the interview. Anunciation was not restrained during the interviews, which took place over a period of approximately two hours. He repeatedly acknowledged he understood he was free to go, and he actually left the station. He willingly accepted a ride home from officers and agreed to return to the station to answer additional questions. The detective's questioning remained low-key and conversational. A reasonable person in Anunciation's circumstances would have felt free to terminate the questioning and leave. (Cf. *U.S. v. Norris* (9th Cir. 2005) 428 F.3d 907, 911 [defendant was not in custody when he voluntarily accompanied officers to police station; was told his cooperation was voluntary, he was free to terminate the interview at any time and he was not under arrest; was never restrained in any way; and, upon completion of interview, was taken home by officers]; *U.S. v. Kim* (9th Cir. 2002) 292 F.3d 969, 974-975 ["If the police ask—not order—someone to speak to them and that person comes to the police station, voluntarily, precisely to do so, the individual is likely to expect that he can end the encounter"]; *Green v. Superior Court* (1985) 40 Cal.3d 126, 131-135 [concluding a reasonable person would not have felt in custody when defendant

18

voluntarily accompanied officers to station for interview, and officers questioned defendant intermittently in detailed way over total period of two hours within locked room and advised him he could leave if he wished]; *People v. Spears* (1991) 228 Cal.App.3d 1, 22, 25 [concluding defendant was not in custody during hour-long interview at police station in which officers were "courteous and polite" and told defendant at various times he was free to leave].)

Anunciation contends certain facts compel a finding he was in custody, including that he was already the focus of Buompensiero's investigation when he was questioned and the interview took place in the homicide unit's interrogation room at the sheriff's station. We disagree. Even a direct statement to a person under interrogation that he is a prime suspect is not dispositive unless it also "would have affected how a reasonable person in that position would perceive his or her freedom to leave." (*Stansbury*, *supra*, 511 U.S. at p. 325; accord, *In re Joseph R.* (1998) 65 Cal.App.4th 954, 960.) Here, although Anunciation knew from Fletcher that Buompensiero considered him a suspect, Buompensiero did not mention it during Anunciation's interviews. Given the atmosphere of the interviews, Anunciation's voluntary cooperation, and the fact that he came and went, a reasonable person would have felt free to leave, despite being at the sheriff's station and under suspicion. (Cf. *Beheler*, *supra*, 463 U.S. at pp. 1122, 1125 [suspect not in custody despite being target of police investigation, where he accompanied police willingly to station house for questioning].)

19

Anunciation also argues that because he was "released" from custody only briefly between the first and second interviews and then "recapture[d]," it was evident that the police statements that he was free to go were never true, and there was a "taint" that remained from his request for an attorney that lasted through the second interview. We disagree, given our conclusion that he was not in custody. Moreover, the cases that Anunciation relies upon as showing custody are inapposite. (See, e.g., *People v. Esqueda* (1993) 17 Cal.App.4th 1450, 1482 [police took defendant immediately from crime scene, prevented him from going to hospital with his injured wife, and never told him he was free to leave]; *People v. Storm* (2002) 28 Cal.4th 1007 [Supreme Court did not rule on whether defendant accused of lying after flunking a polygraph examination was in custody].)

In sum, the totality of the circumstances shows Anunciation was not "in custody" when he admitted strangling Shallenberger to death.[2] *Miranda* therefore did not require suppression of the admission as having been obtained in violation of Anunciation's Fifth Amendment right against compulsory self-incrimination.

---

[2]     Because we have concluded Anunciation was not in custody when he was given the *Miranda* warnings in the second interview, we need not address his contention he did not validly waive his *Miranda* rights by acknowledging the warnings and continuing to answer questions thereafter. (See *Ochoa*, *supra*, 19 Cal.4th at p. 401 [where suspect not in custody, "'*Miranda* simply [did] not come into play,'" and no waiver was needed].)

C.    *The Trial Court Did Not Prejudicially Err by Refusing to Instruct the Jury on Voluntary Manslaughter*

Anunciation complains the trial court prejudicially erred by refusing his request that the jury be instructed on voluntary manslaughter as a lesser included offense of murder.  He contends such instructions should have been given because there was substantial evidence from which the jury could have found he killed Shallenberger in the heat of passion or in unreasonable self-defense.  Anunciation further contends it is reasonably probable the jury would have found him guilty of voluntary manslaughter rather than second degree murder had the requested instructions been given.  We shall set forth additional pertinent background and then explain why any trial court error in refusing to give voluntary manslaughter instructions was harmless.

1.    *Additional Pertinent Background*

After the close of evidence, Anunciation asked the trial court to instruct the jury on voluntary manslaughter as a lesser included offense of murder.  Anunciation argued that based on his statements to police, which the People introduced as evidence, and Cohen's testimony about the physiological response to a bite on the penis, a reasonable jury could conclude that Anunciation killed Shallenberger in response to the provocation of being bitten or the perceived threat of imminent bodily harm.  Anunciation therefore sought instructions on voluntary manslaughter based on heat of passion and imperfect self-defense.  (See CALCRIM Nos. 570, 571.)

21

The People opposed Anunciation's request. They argued voluntary manslaughter instructions should not be given because there was no substantial evidence that Shallenberger's biting of Anunciation's penis during fellatio induced such an intense emotional response in Anunciation that he lost all reason and judgment, or caused or threatened to cause such serious bodily injury that Anunciation believed he needed to respond with deadly force.

The trial court refused to give the voluntary manslaughter instructions requested by Anunciation.

2.      *Legal Analysis*

We need not, and do not, decide whether the trial court erred by not instructing the jury on voluntary manslaughter because any such error was harmless. A defendant who seeks reversal of a conviction based on trial court error generally must show the error was "prejudicial," i.e., it "resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13; *People v. Archerd* (1970) 3 Cal.3d 615, 643.) In particular, "in a noncapital case, error in failing sua sponte to instruct, or to instruct fully, on all lesser included offenses and theories thereof which are supported by the evidence must be reviewed for prejudice exclusively under [*People v.*] *Watson* [(1956) 46 Cal.2d 818, 836]. A conviction of the charged offense may be reversed in consequence of this form of error only if, 'after an examination of the entire cause, including the evidence' (Cal. Const., art. VI, § 13), it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred (*Watson*, [at p.] 836)." (*People v. Breverman* (1998)

19 Cal.4th 142, 178 (*Breverman*).)  In conducting review under *Watson*, we "focus[] not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration.  In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result."  (*Id.* at p. 177; accord, *People v. Beltran* (2013) 56 Cal.4th 935, 956 (*Beltran*).)  Under this standard, Anunciation has not shown the prejudice required for reversal.

The evidence supporting Anunciation's conviction of second degree murder was "relatively strong."  (*Breverman*, *supra*, 19 Cal.4th at p. 177, italics omitted.)  To establish second degree murder, the People had to prove Anunciation unlawfully killed Shallenberger "with malice aforethought," but without willfulness, premeditation, deliberation or other additional elements that would make the killing first degree murder.  (§§ 187, subd. (a), 189; *People v. Nieto Benitez* (1992) 4 Cal.4th 91, 102.)  "Malice is implied when a person willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses."  (*People v. Gonzalez* (2012) 54 Cal.4th 643, 653.)  Here, Anunciation's admission that he choked Shallenberger until he turned blue and dropped to the floor, Cohen's testimony that Shallenberger died of manual strangulation after being severely beaten for several minutes, and the photograph of

23

Shallenberger's head showing some of his injuries convincingly indicated that Anunciation killed Shallenberger with implied malice. (See *People v. Pool* (2008) 166 Cal.App.4th 904, 908 ["in strangling [the victim], defendant . . . acted with knowledge of the danger to and conscious disregard for life"]; *People v. Matta* (1976) 57 Cal.App.3d 472, 480 ["the jury could have easily inferred malice from the repeated violent beatings appellant inflicted upon the victim which ultimately resulted in his death"].) Further, Anunciation's initial false statement to police that he and Shallenberger did not have oral sex on the day of the killing,[3] and his later statement that he fled the scene after choking Shallenberger until he turned blue and collapsed, "reflected consciousness of guilt." (*Beltran*, *supra*, 56 Cal.4th at p. 957 [flight from crime scene]; see also *People v. Kimble* (1988) 44 Cal.3d 480, 496 ["'False statements deliberately made by defendants to arresting officers concerning matters within [defendants'] own knowledge, and relating to the issue of guilt or innocence, "cogently evidence consciousness of guilt and suggest that there is no honest explanation for incriminating circumstances."'"].) Thus, strong and uncontradicted evidence established Anunciation's guilt of second degree murder.

By contrast, the evidence Anunciation committed voluntary manslaughter rather than murder was "comparatively weak." (*Breverman*, *supra*, 19 Cal.4th at p. 177, italics omitted.) A defendant lacks the malice required for murder and is guilty of voluntary manslaughter, a lesser included offense of murder (*Id.* at p. 154), when he kills in a

---

3     Sperm cells containing DNA matching Anunciation's profile were found in Shallenberger's mouth on the day of the killing.

"sudden quarrel or heat of passion" (§ 192, subd. (a)), or in "imperfect self-defense" (*People v. Rogers* (2006) 39 Cal.4th 826, 883 (*Rogers*)). Manslaughter based on a sudden quarrel or heat of passion requires provocation by the victim that would cause an ordinary person of average disposition to lose reason and judgment and to act rashly. (*People v. Manriquez* (2005) 37 Cal.4th 547, 583-586 (*Manriquez*).) Manslaughter based on imperfect self-defense requires the defendant to have acted in the actual but unreasonable belief that he needed to kill the victim to defend himself against imminent danger of death or great bodily injury. (*People v. Valencia* (2008) 43 Cal.4th 268, 286 (*Valencia*).) Here, Anunciation contends "there was considerable evidence from which [the] jury might have deduced that [he] acted out in either rage or fear," and if the jury had been instructed on these theories of manslaughter, there was a "'reasonable chance'" the jury would have found him guilty of manslaughter rather than murder. (Italics omitted.) Specifically, Anunciation asserts the combination of his own statements to police that Shallenberger bit his penis during fellatio and Cohen's testimony that such a bite could have caused pain that generated a rush of adrenaline "supported the defense theory that [he] reacted without reflection to a perceived threat in the moment with an explosive rage that was commensurate with either heat of passion or imperfect self[-]defense." As we shall explain, however, this evidence does not make it reasonably probable the jury would have found Anunciation guilty of voluntary manslaughter had it been instructed on that offense.

25

Anunciation's statements to police do not support his manslaughter theory.  He never told police he was enraged or felt threatened by Shallenberger.  In fact, when Buompensiero asked Anunciation whether he had gotten into "a scuffle" or "a fight" with, or was "mad at," Shallenberger, Anunciation responded, "No."  Anunciation also never told police he experienced any degree of pain when Shallenberger bit his penis.  During the police interview, Anunciation told Buompensiero the bite did not cause bleeding; and when he was later arrested and booked, Anunciation did not tell police his penis hurt or required medical attention.  In fact, the only emotion Anunciation ever told police he experienced in connection with the bite to his penis was disgust:  Anunciation was "grossed . . . out" when Shallenberger, while performing fellatio, started "choking" and "bit on" his penis.  This "statement said little suggesting [Anunciation] believed he had to [strangle Shallenberger] to death to defend against imminent death or great bodily injury."  (*Valencia*, *supra*, 43 Cal.4th at p. 286.)  Nor does Anunciation's statement suggest "anger, fury, or rage" (*Manriquez*, *supra*, 37 Cal.4th at p. 585), or some other "'[v]iolent, intense, high-wrought, or enthusiastic emotion'" (*People v. Borchers* (1958) 50 Cal.2d 321, 329), that would "cause an ordinary person of average disposition . . . to lose reason and judgment" (*People v. Thomas* (2012) 53 Cal.4th 771, 813 (*Thomas*)).  The disgust briefly felt by Anunciation does not qualify as the type of "extreme intensity of the heat of passion required to reduce a murder to manslaughter."  (*Beltran*, *supra*, 56 Cal.4th at p. 950.)

26

Cohen's testimony, on which Anunciation also relies in support of his voluntary manslaughter theory, actually undermines that theory. As we noted in part I., *ante*, Cohen testified a bite to the penis would cause pain, which in turn would cause a discharge of adrenaline and a reflexive response to avoid the biter. But Cohen made clear the amount of adrenaline released in response to such a bite would not be significant, and the associated avoidance response would be short-lived. When asked specifically whether the reflexive response induced by a bite to the penis during fellatio could explain the injuries inflicted on Shallenberger, Cohen responded, "Of course not." Cohen thus expressly and emphatically disagreed with Anunciation's theory that he reacted to being bitten on the penis "with an explosive rage that was commensurate with either heat of passion or imperfect self[-]defense."

Other evidence introduced at trial is also inconsistent with Anunciation's theory of voluntary manslaughter. There was evidence Anunciation did not suffer any serious injury to his penis from Shallenberger's bite. Anunciation told Buompensiero the bite did not cause bleeding; and when Anunciation was arrested and booked, police performed a physical examination in which they specifically looked for but observed no injury to his penis. There was also evidence Shallenberger presented no threat of harm to Anunciation. Shallenberger was a frail octogenarian who wore an ankle brace and walked with a cane. Shallenberger had paid to perform fellatio on Anunciation on multiple occasions over the course of "a couple years." The evidence thus showed that any bite to Anunciation's penis was minor and occurred during a consensual sex act with

27

an enfeebled, elderly man who had paid Anunciation for sex in the past.  Given these additional facts, it is not reasonably probable the jury would have concluded Anunciation killed Shallenberger because the bite caused him to become "so inflamed as to lose reason and judgment" (*Thomas*, *supra*, 53 Cal.4th at p. 813) or to believe he "need[ed] to defend against imminent danger 'to life or great bodily injury'" (*Valencia*, *supra*, 43 Cal.4th at p. 286).

Anunciation also argues the length of the jury deliberations in the first trial indicates this was a close case between murder and manslaughter, and therefore the refusal to instruct the jury in the second trial on manslaughter was prejudicial.  He asserts:  "Merely to state the contrast between the length of deliberations in the first and second juries is to demonstrate the prejudice of the error here."  More specifically, he points out that the first jury, which received voluntary manslaughter instructions, "was unable to reach a verdict after more than five days of deliberations"; but the second jury, "with no manslaughter instructions and thus no choice but murder, . . . returned a verdict in less than one day."  From this disparity, Anunciation contends "the evidence presented a close question as to whether the crime was murder or manslaughter, and when an error goes to a central issue in a case where the facts are close, that error cannot be deemed harmless."  We are not persuaded.

Appellate courts "have sometimes inferred from unduly lengthy deliberations that the question of guilt was close." (*People v. Cooper* (1991) 53 Cal.3d 771, 837.) Anunciation cites several cases in which reviewing courts concluded a case was close in

28

part because the jury deliberations that produced the verdict being challenged on appeal were lengthy. In none of the cited cases, however, did the court conclude (or even consider) that a retrial that produced a verdict after a few hours of deliberations was a close case because in a prior trial a different jury deliberated for days but was unable to reach a verdict. "It is axiomatic, of course, that a decision does not stand for a proposition not considered by the court." (*People v. Harris* (1989) 47 Cal.3d 1047, 1071.) In any event, "the fact that a jury may have deliberated for a long period of time permits more than a single interpretation" (*In re Pratt* (1999) 69 Cal.App.4th 1294, 1322); and an interpretation that is plausible as to an initial trial may not be plausible as to a retrial, because the jurors in the two trials will be different, different evidence may be presented, and the witnesses' credibility may change. In fact, the trial court here refused to instruct the second jury on voluntary manslaughter in part because "this time, different than last time, we have Cohen not agreeing with" Anunciation that the killing was a "[r]eflexive reaction." Given this and other differences between the two trials, "to conclude that [the second trial] was a 'close case' in light of the jury's action [in the first trial] 'in the absence of more concrete evidence would amount to sheer speculation on our part.'" (*People v. Houston* (2005) 130 Cal.App.4th 279, 301.) To demonstrate the prejudice required for reversal, however, Anunciation may not rely on "speculation as to the jury's deliberative process." (*People v. Sassounian* (1986) 182 Cal.App.3d 361, 404, fn. 46; see also *People v. Gray* (2005) 37 Cal.4th 168, 230 ["pure speculation . . . will not support a reversal of the judgment"].)

29

In sum, Anunciation's retrial did not present a close case between murder and manslaughter. "Given the strong evidence supporting [Anunciation's] murder conviction and the comparatively weak evidence of any legally adequate provocation [or any threat of imminent death or great bodily injury], a different result was not reasonably probable." (*Beltran*, *supra*, 56 Cal.4th at p. 957.) Any error in the trial court's refusal to instruct the jury on voluntary manslaughter based on heat of passion of imperfect self-defense was therefore harmless. (*Rogers*, *supra*, 39 Cal.4th at pp. 867-868; *Breverman*, *supra*, 19 Cal.4th at pp. 177-178.)

## DISPOSITION

The judgment is affirmed.

IRION, J.

WE CONCUR:

HALLER, Acting P. J.

O'ROURKE, J.

30